# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * * * * * * *
NEIL SILVER,                              *
                                          *
        Petitioner,                  *   Case No. 20-141
                                          *
v.                                        *   Ruling on onset; Influenza ("Flu") Vaccine;
                                          *   Guillain-Barré syndrome ("GBS"); leg pain;
SECRETARY OF HEALTH                       *   numbness; tingling
AND HUMAN SERVICES,                       *
                                          *
        Respondent.                  *
* * * * * * * * * * * * * * * * * * * * * * * *

*Ira M. Newman*, Sanocki, Newman & Turret, LLP, New York, NY, for petitioner,
*Nina Ren*, United States, Dep't of Justice, Washington, DC, for respondent.

## **FINDING OF FACT**[1]

      Neil Silver filed a petition for compensation under the National Vaccine Injury Compensation Program on February 10, 2020. Pet. Mr. Silver alleges that roughly three or four weeks after he received the flu vaccine on January 8, 2019, he began experiencing numbness, tingling, and pain in his legs. Pet. ¶ 4. In Mr. Silver's view, these symptoms signify the initial manifestation of Guillain-Barré syndrome ("GBS"). Respondent disagrees, arguing that "petitioner did not present with the onset of GBS until early June of 2019, approximately five months after vaccination." Resp't's Rep., at 6. A fact-finding hearing was held on November 16, 2021 to determine when Mr. Silver began having these problems. For the reasons discussed below, Mr. Silver is found to have experienced onset of leg pain, numbness, and tingling during the last week of January 2019.

**I.**    **Procedural History**

      Mr. Silver filed a petition for compensation under the National Vaccine Injury Compensation Program—along with an affidavit and medical records—on February 10, 2020. Pet'r's Pet.; Exhibits 1-2. Mr. Silver alleges that roughly three or four weeks after he received

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

the flu vaccine, he began to have numbness, tingling, and pain in his legs. Pet. ¶ 4. Over the next eight months after filing his petition, Mr. Silver submitted additional medical records and evidence to support his claim. See generally Exhibits 1-16.[2]

On January 31, 2021, the Secretary filed his Rule 4(c) Report. Resp't's Rep. The Secretary argued "petitioner's description of 'slowly progress[ing]' symptoms [were] unreported to his physicians beginning in mid- to late January of 2019" and suggested that this "[wa]s not consistent with the acute onset of GBS in June." Id. at 8. The Secretary went on to state that "medical records show that [Mr. Silver] did not present with onset of GBS until early June 2019, approximately five moments after vaccination," meaning that "onset of . . . GBS was well outside the Table Frame of 3-42 days following vaccination." Id. at 6

A status conference was then held on February 19, 2021 to discuss Mr. Silver's updated medical records and the Secretary's report. See Order, issued Feb. 19, 2021. There, petitioner was told to file an affidavit regarding the onset of his symptoms. Id.; see also Order, issued June 9, 2022; Order, issued July 28, 2021.

A virtual hearing was held via Microsoft Teams on Tuesday, November 16, 2021. See id. Testimony was provided by Mr. Silver, Ms. Robyn Cohen (Mr. Silver's wife), and Mr. Silver's friend, Mr. Richard Baumer. Their testimony and the materials contained in the record are the basis for the findings of fact made below.

Although the parties attempted to enter into a settlement agreement, efforts to settle the cases were unsuccessful. As a result, the parties requested a ruling. This matter is now ripe for a finding of fact regarding the issue of onset.

II.     **Factual Assertions**

Mr. Silver was generally healthy prior to receiving his flu vaccine. In 2013, Mr. Silver was diagnosed with Parsonage Turner Syndrome ("PTS"). Id. PTS is a "neuralgic amyotrophy," which typically presents as "pain across the shoulder and upper arm, with atrophy and paralysis of the muscles of the shoulder girdle." Dorland's Illust. Med. Dictionary, at 70, 1319 (32nd ed. 2012). Mr. Silver claims that when he was diagnosed with PTS, he "did not experience any lower extremities complaints or back pain . . . and never had leg weakness or shoot[ing] pains in [his] legs and never ha[d] difficulty walking . . . fatigue and generalized weakness." Exhibit 15 (Silver Aff.) ¶ 7. He did, however, experience a right winged scapula, transient arm pain, sensitivity to cold, numbness and weakness with a tingling sensation in his hands as a result of PTS. Id.

Affidavits from Mr. Silver, Ms. Robyn Cohen, and Mr. Richard Baumer, also provide a picture of a man who was in "good health" and "active on a regular basis" prior to January 2019. Exhibit 15 (Silver Aff.) ¶ 6; see also Exhibit 13 (Cohen Aff.); Exhibit 16 (Baumer Aff.). Mr. Silver played in weekly pick-up basketball games with his friends (including Mr. Baumer),

---

[2] See also Pet'r's Notice of Filing, filed Dec. 9, 2020 (showing Mr. Silver refiled Exhibits 1-16).

enjoyed taking walks with his wife and their dogs, and went on active and adventurous vacations.  See Exhibit 15 (Silver Aff.) ¶ 6; Exhibit 13 (Cohen Aff.) ¶ 5; see also Tr. at 23.  Mr. Baumer described Mr. Silver's "health and physical condition" prior to January 2019 as being "first rate" and that Mr. Silver was "always . . . one of the most fit and competitive athletes in [thei]r age group."  Exhibit 16 (Baumer Aff.) ¶ 7.

On January 8, 2019, at the age of 62, Mr. Silver visited his cardiologist, Dr. Alan Hecht, for a cardiovascular/medical follow-up.  Exhibit 10 at 96.  In addition to routine evaluations, Mr. Silver also received the flu vaccine at this January 8, 2019 appointment because he recently "became a grandfather, and [his] son asked [him] to go get the flu vaccine" before visiting.  Tr. at 22.  Prior to receiving the flu vaccine on that date, Mr. Silver had never previously received a flu vaccine.  Tr. at 21.

Mr. Silver, Ms. Cohen, and Mr. Baumer assert that Mr. Silver began exhibiting health problems soon after receiving the flu vaccine.  Mr. Silver's onset affidavit claims he "began experiencing left lower extremity pain shooting down [his] leg and weakness in [his] left leg periodically *in or about late January/early February, 2019*."  Exhibit 18 (Silver Onset Aff.) at 2-3 (emphasis added).  Mr. Silver described these issues as causing "pain and weakness in [his] legs," "hot shooting pains down the outside of [his] legs sometimes shooting up [his] calf into [his] hamstring," "tingling sensation in [his] feet and legs," and "legs fe[eling] heavy . . . [with] chronic muscle pain."  Exhibit 15 (Silver Aff.) ¶ 10.

Ms. Cohen testified that she "noticed a huge decline" in Mr. Silver's energy, Tr. at 120, and that Mr. Silver complained to her around the end of January 2019 about having "pain and discomfort in his back, legs, and feet, and later in his upper arms and hands."  Exhibit 13 (Cohen Aff.) ¶ 8.  She also stated that Mr. Silver began to struggle "walking up the stairs" and "rel[ied] on the banister to assist/pull him up the stairs."  Id.[3]

Mr. Baumer testified that Mr. Silver's energy declined to the point where Mr. Silver began sitting out of their weekly pick-up basketball games and progressed to where "[he] just stopped playing completely."  Tr. at 171. Mr. Baumer further stated that Mr. Silver told him that "he was having trouble running, because his legs were hurting and felt like there were sharp, fire-like shooting pains in his legs."  Exhibit 16 (Baumer Aff.) ¶ 8.  Mr. Baumer stated these comments "were at the same time that [Mr. Silver's] . . . physical ability to play the game at the level that he played before was becoming much more limited."  Id.

---

[3] Ms. Cohen compared Mr. Silver's prior experience with PTS to what he experienced in January and February of 2019.  She noted that his "[PTS] only affected his upper body and from his elbows to his shoulders . . . and a little bit in the upper back, but it had no effect on his legs, on his energy level or like the weakness, the pain, the shooting pain that he would get in his legs." Tr. at 123.  During the fact-finding hearing, the Secretary did not question Ms. Cohen about her opinion as to when Mr. Silver began to have pain, numbness, or tingling in his legs.  See id. at 148-52 (showing the Secretary asked questions on what medications Mr. Silver took, and whether Mr. Silver experienced flu-like symptoms during the late January, early February timeframe).

Only one medical record between January 2019 (after his vaccination) until June 5, 2022 was submitted in the record. On April 25, 2019, Mr. Silver visited a dermatology center, where he reported having "multiple lesions on [the] face" for which he later received cryosurgery. Exhibit 7 at 9-10. However, these medical records do not contain notes stating Mr. Silver told his dermatologists about any pain, numbness, or tingling in his legs.

Although there are no contemporaneous medical records during January 2019/February 2019, Mr. Silver did file a copy of contemporaneous gym records showing that he visited the gym seven times in January 2019, the last visit occurring on January 29. Exhibit 19. However, Mr. Silver did not go back to the gym at all in February 2019, and only revisited the gym six more times over the next four months.[4] Id.

Ms. Cohen testified that around March or April of 2019, she and Mr. Silver planned roughly a week-long trip to Zurich, Switzerland. Tr. at 90. They would depart in the evening on June 4, 2019 from New York City. Prior to their flight, Mr. Silver visited his internist physician, Dr. John Scrocca, on the morning of June 4, 2019 for treatment regarding brachial plexus neuropathy, myalgias, neck pain, and pain down both his arms and hands. Exhibit 7 at 12-13. Dr. Scrocca conducted a neurological exam and recorded that Mr. Silver had "1+ weakness in both upper extremities." Id. at 13. There is no record of Mr. Silver mentioning any of his alleged leg pain, numbness, or tingling at this visit. Id. at 12-14. During the fact-finding hearing, Mr. Silver was questioned as to why he did not mention his right and left leg pain/fatigue to Dr. Scrocca. Tr. at 98. Mr. Silver stated he "didn't think anything of it" because "it was a few months back" and because he "was totally focused . . . on [his] arms and [his] shoulders." Id. At the end of visit, Dr. Scrocca cleared Mr. Silver to fly and stated that he would need to "be treated with a methylprednisolone Dosepak and Valium 2 mg at bedtime upon his return." Exhibit 7 at 13.

Mr. Silver and his wife then flew to Zurich on the evening of June 4, 2019. While in Zurich, Mr. Silver's health began to deteriorate. Ms. Cohen testified Mr. Silver had to take multiple rest breaks during their walk around the city, that he became nauseous, and started to have difficulty standing and sitting. Mr. Silver then called his neurologist, Dr. Amy Hua, on the morning of June 6, 2019. Tr. at 139. Because Mr. Silver had developed "difficulty with swallowing, and distal upper and lower extremity weakness," Dr. Hua advised Mr. Silver to "seek medical attention in the nearest emergency room."[5] Exhibit 12 at 14. Ms. Cohen then called emergency services in Zurich which then transported her and Mr. Silver to Zurich University Hospital. Tr. at 139-40.

---

[4] The Secretary did not appear to refute this attendance record nor question the content of it during the fact-finding hearing. See generally Tr.

[5] Mr. Silver's Onset Affidavit acknowledges that he did not tell his neurologist, Dr. Amy Hua, about experiencing left leg and right leg shooting pains, numbness, and/or tingling while walking in late January/early February during their June 6, 2019 phone call. Exhibit 18 (Silver Onset Aff.) at 3. Mr. Silver explains his decision to exclude this information by stating that he contacted Dr. Hua on June 6, 2019 only to "tell her of [his] developing condition" because he "was on the verge of paralysis . . . [and] was concerned with [his] immediate circumstances." Id.

4

Mr. Silver was admitted to Zurich University Hospital on June 6, 2019 and remained there until June 18, 2019.  Once admitted, Mr. Silver was "noted to have flaccid tetraparesis, areflexia." Exhibit 4.1 at 10.  An EMG/NCS test was conducted on June 7, which showed "markedly prolonged latencies with predominantly demyelinating disease, [consistent with] Guillain Barré Syndrome, and some axonal loss."  Id.  He was later diagnosed with Guillain Barré Syndrome, Miller-Fisher subtype. Exhibit 3.1 at 1.  On June 10, Mr. Silver suffered from "tachycardia/afib for which [an] amiodarone drip . . . [and] a therapeutic heparin drip" were given. Exhibit 4.1 at 10.  Mr. Silver then developed microhematuria and was treated with Augmentin for pneumonia.  Mr. Silver went into "respiratory failure with the need for artificial ventilation on June 11th."  Id.; Exhibit 3.1 at 2.  On June 15, he received a tracheotomy and was put on a ventilator.  Exhibit 4.1 at 10.  Mr. Silver was discharged from Zurich University Hospital and medevacked back to Columbia Presbyterian Hospital in the United States on June 18, 2022.  Tr. at 144; Exhibits 4.1-4.4.  Mr. Silver then underwent a lengthy recovery.[6]

Medical records from New York Presbyterian state that Mr. Silver's "symptoms started prior to travel on 6/3 with new weakness and pain in the shoulder and arms, which progressed to weakness in the legs on 6/5/19." Exhibit 4.1 at 10, 18.  However, these records were taken on June 18, 2022, a time when Mr. Silver was still intubated and connected to a ventilator.  Id. at 11. Thus, this information appears to have been provided to Mr. Silver's treaters by his wife, Ms. Cohen.  Id. at 10, 18 (noting that "per his wife, he had no significant improvement" with the medication Mr. Silver was given at Zurich University Hospital).

After undergoing physical, occupational, and speech-language therapy, Mr. Silver went to see Dr. Hua on October 8, 2019, where he complained that he had "falling/walking difficulty, poor balance, and numbness/tingling." Exhibit 12 at 16.  Although the record stated "he had received a flu shot in February 2019" the records only show that "he had no acute symptoms of [upper respiratory infections] or illness *in June 2019*"—thus nothing in these records discuss whether he was experiencing the pain, numbness, and tingling in his legs on, or around, the time of January 2019 / February 2019.  Id. at 14 (emphasis added).  It was only until October 19, 2019, several months after Mr. Silver was hospitalized, that Mr. Silver's medical records show Mr. Silver told his pulmonary doctor, Claudia M. Felberg, that he began having "shooting pains" that occurred "a few weeks after[] [his] Flu shot." Exhibit 7 at 15.

### III.   Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing his claims by preponderant evidence.  42 U.S.C. § 300aa–13(1)(a).  A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process of finding facts in cases within the Vaccine Program begins with analyzing medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa-11(c)(2).

---

[6] A discussion regarding Mr. Silver's recovery is not relevant for the determination of symptom onset.

Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). This is because a patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. Reusser v. Sec'y of Health & Hum. Servs., 28 Fed. Cl. 516, 523 (1993); see Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd 968 F.2d 1226 (Fed. Cir. 1992) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1948)).

Despite the weight afforded to contemporaneous medical records, special masters are not rigidly bound by those records in determining onset of a petitioner's symptoms. Vallenzuela v. Sec'y of Health & Hum. Servs., 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (explaining that 42 U.S.C § 300aa- 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record . . . but does not require the special master or court to be bound by them"). Although contemporaneously written medical records are usually more significant than oral testimony, "this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking." Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, at 779.

For example, the court noted "medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant." Murphy, 23 Cl. Ct. at 727 (internal citation omitted). Furthermore, an "absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." Id. at 733. Kirby appears to expand this reasoning, noting that "[a]lthough a patient has a 'strong motivation to be truthful' when speaking to his physician, . . . that does not mean he will report every ailment he is experiencing, or that the physician will accurately record everything he observes." Kirby v. Sec'y Health & Hum. Servs., 997 F.3d 1378, 1383 (Fed. Cir. 2021); see also id. ("A patient having a heart attack is not likely to mention his runny nose, nor is his physician likely to record it."). In Kirby, the Federal Circuit found there was "no evidence" from the medical records in that case suggesting that the petitioner and physician "discussed all possible neurological symptoms or conditions" that petitioner experienced. Id.

Accordingly, there times where compelling oral testimony may be more persuasive than written records. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (noting that whether contemporaneous medical records or later-given oral testimony is more persuasive is a determination that "is uniquely within the purview of the special master").

The Court of Federal Claims has listed four possible explanations for inconsistencies between medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a

witness's credibility is needed when determining the weight that such testimony should be afforded.  Andreu ex rel Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records.  An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying.  Id. at 1379; Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).  Accordingly, a competent petitioner's testimony regarding symptom onset may be deemed to be credible evidence.  See James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1380 (Fed. Cir. 2021).

**IV.      Analysis**

This ruling concerns when Mr. Silver began experiencing pain, numbness, and tingling in his legs.  This question regarding when Mr. Silver's symptoms began is difficult due to the lack of contemporaneous medical records during the late January 2019, early February timeframe.

On April 25, 2019 and June 4, 2019, Mr. Silver visited two different physicians, but at neither appointment discussed that he had, or was experiencing, leg pain, numbness, or tingling since late January 2019.  As previously stated, a "patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable." Reusser, 28 Fed. Cl. at 523.  Respondent argues that this lack of notation on the medical records illustrates that the symptoms had yet to occur on or before that time.  See Resp't's Rep., at 6, 8.

Kirby, however, states that "[a]lthough a patient has a 'strong motivation to be truthful' when speaking to his physician, . . . that does not mean he will report every ailment he is experiencing, or that the physician will accurately record everything he observes."  997 F.3d at 1383.  Mr. Silver testified that the reason he did not mention his leg pain, numbness, or tingling during his June 4, 2019 visit to Dr. Scrocca, was because "it was a few months back" and at the time, he was "totally focused on [his] arms and [his] shoulders."[7]  Tr. at 98.  Moreover, the fact that Mr. Silver did not discuss the numbness and tingling in his legs does not, by itself, prove that he did not experience these symptoms during the last week of January 2019.  See Murphy, 23 Cl. Ct. at 733 ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.").  Thus, like Kirby, it is plausible to believe that Mr. Silver did not "discuss[] *all possible* neurological symptoms or conditions" he experienced during his visit with Dr. Scrocca.  997 F.3d at 1383 (emphasis added).

Accordingly, given the lack of contemporaneous medical records and the absence of medical records directly negating Mr. Silver's assertion regarding his symptom onset, other materials in the record must be considered.

When affidavits, testimony, and non-medical records are used to overcome the presumption of accuracy afforded to contemporaneous medical records, such evidence must be "consistent, clear, cogent, and compelling." Popwell v. Sec'y of Health & Hum. Servs., No. 17-1301V, 2021 WL 850801, at *4 (Fed. Cl. Jan. 27, 2021). The materials submitted in this case meet this standard.

Mr. Silver submitted contemporaneous gym records showing that prior to late January, he visited his gym on a regular basis. Exhibit 19. Then, after January 29, 2019, Mr. Silver stopped regularly going to the gym and only visited it six more times over the next four months. Id. During the fact-finding hearing, Respondent did not question Mr. Silver on these records.

Affidavits and testimony from Mr. Silver, Ms. Cohen, and Mr. Baumer also provide support for Mr. Silver's assertion that his symptoms began roughly the last week of January.

Mr. Silver's affidavit and testimony stated he began experiencing pain, numbness, and tingling in late January 2019, early February 2019. Exhibit 15 (Silver Aff.) ¶ 3; see also Tr. at 29. Ms. Cohen's affidavit noted that Mr. Silver complained of "pain and discomfort in his back, legs, and feet, and later in his upper arms and hands" in the middle to late January 2019. Exhibit 13 (Cohen Aff.) ¶ 8. She further testified at the hearing that she "noticed a huge decline in his energy levels, . . . that he as getting aches and pains, which were unusual" around January 2019. Tr. at 120. One such example was Ms. Cohen's statement that it became "increasingly difficult" for Mr. Silver to "walk up the stairs" and that he had to "rely on the banister to assist/pull him up the stairs." Id. Although the Secretary could have questioned Ms. Cohen on the timing of these symptoms during the hearing, he did not, and instead asked questions about Mr. Silver's medications and whether he had any other symptoms during that time. See id. at 148-52.

Mr. Baumer also testified that Mr. Silver appeared to exhibit leg problems around the end of January 2019. Prior to that time, Mr. Baumer testified that Mr. Silver had "great stamina" and was "one of the most fit and competitive athletes in [thei]r age group," calling Mr. Silver's health and physical condition "first rate." Exhibit 16 (Baumer Aff.) ¶ 2. Toward the end of January 2019, however, Mr. Baumer testified that Mr. Silver told him that "he was having trouble running, because his legs were hurting and felt like there were sharp, fire-like shooting pains in his legs." Id. ¶ 8. Moreover, Mr. Baumer witnessed Mr. Silver not only become more fatigued, sitting out during their basketball games, and but also watched as he "stopped playing completely" in their weekly basketball pick-up games. Tr. at 171. When the Secretary questioned Mr. Baumer on what, if anything, he personally witnessed regarding Mr. Silver's deterioration in health during that time, Mr. Baumer testified that he saw him go from being "somebody who was the most energetic sort of athletic player to a player who was often fatigued, stopped playing, wasn't nearly as energetic, effective." Id. at 176.

In evaluating the credibility of testifying witnesses, special masters have broad discretion in weighing witnesses' demeanor and candor. Andreu, 569 F.3d at 1379; Bradley, 991 F.2d at 1575. Here, Mr. Silver, Ms. Cohen, and Mr. Baumer all presented as credible witnesses in the sense that each person appeared to be testifying as honestly as his or her recollection of events would permit. The credibility of the testimony was enhanced because the witnesses anchored their testimony around certain events, for example, when Mr. Baumer stopped playing in his

8

weekly pick-up games. The credibility of the witnesses' testimonies was also strengthened by the existence certain unknowns from one witness to another, suggesting that each person was testifying based on his or her own memory, and that their testimony was not pre-rehearsed nor developed together. For these reasons, the testimony of Mr. Silver, Ms. Cohen, and Mr. Baumer fill the gap in information left in the medical records.

Finally, Mr. Silver reported having "shooting pains" "a few weeks" after his flu shot to Dr. Felberg on October 19, 2019. Exhibit 7 at 15. While this October 19, 2019 report is not contemporaneous with events in late January 2019 / early February 2019, Mr. Silver provided this statement outside of the context of litigation. It does not appear that Mr. Silver had any nefarious motivation for providing an intentionally incorrect account to a treating doctor. Consequently, Dr. Felberg's medical record provides some ancillary support to this finding. See Tenneson v. Sec'y of Health & Hum. Servs., 142 Fed. Cl. 329 (2019) (indicating that a special master is not arbitrary in relying upon a non-contemporaneous medical record to determine when symptoms began).

Thus, upon review of the entire record, the undersigned finds preponderant evidence that Mr. Silver's alleged pain, numbness, and tingling in his legs began during the last week of January 2019. This finding is based in part on the testimony and affidavits of Mr. Silver, Ms. Cohen, and Mr. Baumer, as well as Mr. Silver's contemporaneous gym records. See Exhibit 13 (Cohen Aff.); Exhibit 15, (Silver Aff.); Exhibit 16 (Baumer Aff.); Exhibit 18 (Silver Onset Aff.); Exhibit 19 (Mr. Silver's gym records). Although Mr. Silver has two medical records prior to his hospitalization, nothing in those records directly negate his claim regarding symptom onset.

The finding that Mr. Silver had pain, numbness, and tingling in his legs starting at the end of January needs to be placed in context. Although Mr. Silver experienced some pain, he was still able to walk his dogs with his wife. Similarly, although Mr. Silver required frequent breaks when he played basketball with his peers, he still was able to play until April of 2019. These activities stand in contrast to his condition while hospitalized in Zurich, when he was placed on a ventilator and could not walk at all.

Under these circumstances, the undersigned is not determining when Mr. Silver began to experience a manifestation of GBS. See Knudsen by Knudsen v. Sec'y Health & Hum. Servs., 35 F.3d 543, 549 (Fed. Cir. 1994) ("special masters are not 'diagnosing' vaccine-related injuries"). Whether leg pains, numbness, and tingling in January 2019 is consistent with a diagnosis of GBS in June 2019 will require evidence from an expert.

V.      Conclusion

The onset of petitioner's pain, numbness, and tingling in his legs began during the last week of January 2019.  **The parties are ordered** to provide a copy of this fact ruling to any expert witnesses.  The experts must rely on the facts as found in this Ruling.  Opinions that are inconsistent with this finding are unlikely to be credited.  See Burns, 3 F.3d at 417.

A status conference is set, *sua sponte*, for **Wednesday, January 11, 2023 at 10:00 A.M.** The parties are encouraged to consider whether after this finding, an informal resolution based upon the costs and risks of continued litigation is appropriate.  If the parties are not mutually interested in resolving this case, then a schedule for reports from experts will be set.  See Resp't's Status Rep., filed Mar. 30, 2022.

**IT IS SO ORDERED.**

> s/Christian J. Moran
> Christian J. Moran
> Special Master