# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * *
NEIL SILVER,                          *
                                      *
            Petitioner,               *      No. 20-141V
                                      *
v.                                    *      Special Master Christian J. Moran
                                      *
SECRETARY OF HEALTH                   *      Filed: June 8, 2026
AND HUMAN SERVICES,                   *
                                      *
            Respondent.               *
                                      *
* * * * * * * * * * * * * * * * * * * * *
```

Ira M. Newman, Sanocki, Newman & Turret, LLP, New York, NY, for petitioner,
Nina Ren, United States, Dep't of Justice, Washington, DC, for respondent.

### DECISION DENYING ENTITLEMENT TO COMPENSATION[1]

Neil Silver alleges that an influenza vaccination, which was given to him on January 8, 2019, caused him to develop Guillain-Barré syndrome. Pet., filed Feb. 10, 2020. The parties agree that he was diagnosed with GBS in early June 2019, about five months after the vaccination.

Mr. Silver claims that he began suffering from GBS months before he was diagnosed, placing the onset of the GBS much closer in time to the January 8, 2019 flu vaccination. He supports his claim with reports from a neurologist whom Mr. Silver retained, Lawrence Shields. Mr. Silver also advocated through one brief.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

The Secretary disputes the argument that Mr. Silver began suffering GBS in January 2019.  To challenge opinions presented by Dr. Shields, the Secretary has retained a different neurologist, Dara Jamieson.  Like Mr. Silver, the Secretary has argued his position in one brief.

For reasons explained below, Dr. Shields is not persuasive in opining that Mr. Silver suffered from GBS in January 2019.  Instead, Dr. Jamieson is persuasive in opining that Mr. Silver began to suffer from GBS in June 2019.  This finding is dispositive and means that Mr. Silver is not entitled to compensation.  Accordingly, the Clerk's Office is instructed to enter judgment in accord with this decision.

## I.    Medical Events in Mr. Silver's Life

### A.    Health before and through Vaccination / January 8, 2019

Mr. Silver was generally healthy prior to receiving his flu vaccine.  In 2013, Mr. Silver was diagnosed with Parsonage Turner Syndrome ("PTS").  Id.  PTS is a "neuralgic amyotrophy," which typically presents as "pain across the shoulder and upper arm, with atrophy and paralysis of the muscles of the shoulder girdle."  Dorland's Illust. Med. Dictionary, at 70, 1319 (32nd ed. 2012).  Mr. Silver claims that when he was diagnosed with PTS, he "did not experience any lower extremities complaints or back pain . . . and never had leg weakness or shoot[ing] pains in [his] legs and never ha[d] difficulty walking . . . fatigue and generalized weakness."  Exhibit 15 (Silver Aff.) ¶ 7.  He did, however, experience a right winged scapula, transient arm pain, sensitivity to cold, and numbness and weakness with a tingling sensation in his hands as a result of PTS.  Id.

Affidavits from Mr. Silver, Ms. Robyn Cohen Silver (Mr. Silver's wife), and Mr. Richard Baumer (Mr, Silver's friend) also provide a picture of a man who was in "good health" and "active on a regular basis" prior to January 2019.  Exhibit 15 (Silver Aff.) ¶ 6; see also Exhibit 13 (Cohen Aff.); Exhibit 16 (Baumer Aff.).  Mr. Silver played in weekly pick-up basketball games with his friends (including Mr. Baumer), enjoyed taking walks with his wife and their dogs, and went on active and adventurous vacations.  See Exhibit 15 (Silver Aff.) ¶ 6; Exhibit 13 (Cohen Aff.) ¶ 5; see also Tr. at 23.  Mr. Baumer described Mr. Silver's "health and physical condition" prior to January 2019 as being "first rate" and that Mr. Silver was "always . . . one of the most fit and competitive athletes in [thei]r age group."  Exhibit 16 (Baumer Aff.) ¶ 7.

On January 8, 2019, at the age of 62, Mr. Silver visited his cardiologist, Dr. Alan Hecht, for a cardiovascular/medical follow-up.  Exhibit 10 at 96.  In addition to routine evaluations, Mr. Silver also received the flu vaccine at this January 8, 2019 appointment because he recently "became a grandfather, and [his] son asked [him] to go get the flu vaccine" before visiting.  Tr. at 22.  Prior to receiving the flu vaccine on that date, Mr. Silver had never previously received a flu vaccine.  Tr. at 21.

### B.    Health from January 9, 2019 to June 3, 2019

This approximate six-month period is the critical time for Mr. Silver's claim.  During this time, Mr. Silver saw only one medical professional.  On April 25, 2019, Mr. Silver visited a dermatology center, where he reported having "multiple lesions on [the] face" for which he later

received cryosurgery.  Exhibit 7 at 9-10.  However, these medical records do not contain notes stating Mr. Silver told his dermatologists about any pain, numbness, or tingling in his legs.

Although there are no contemporaneous medical records during January 2019/February 2019, Mr. Silver did file a copy of contemporaneous gym records showing that he visited the gym seven times in January 2019, the last visit occurring on January 29.  Exhibit 19.  However, Mr. Silver did not go back to the gym at all in February 2019, and only revisited the gym six more times over the next four months.  Id.

After a process leading to a hearing, the undersigned made the following findings of fact:

> Mr. Silver's alleged pain, numbness, and tingling in his legs began during the last week of January 2019.  This finding is based in part on the testimony and affidavits of Mr. Silver, Ms. Cohen, and Mr. Baumer, as well as Mr. Silver's contemporaneous gym records.  See Exhibit 13 (Cohen Aff.); Exhibit 15, (Silver Aff.); Exhibit 16 (Baumer Aff.); Exhibit 18 (Silver Onset Aff.); Exhibit 19 (Mr. Silver's gym records).  Although Mr. Silver has two medical records prior to his hospitalization, nothing in those records directly negate his claim regarding symptom onset.
>
> The finding that Mr. Silver had pain, numbness, and tingling in his legs starting at the end of January needs to be placed in context.  Although Mr. Silver experienced some pain, he was still able to walk his dogs with his wife.  Similarly, although Mr. Silver required frequent breaks when he played basketball with his peers, he still was able to play until April of 2019.

Finding of Fact, issued December 16, 2022.  However, the undersigned declined to state whether these problems were a manifestation of GBS.

### C.    Health from June 4, 2019 to June 18, 2019 (largely Zurich, Switzerland)

Ms. Cohen testified that around March or April of 2019, she and Mr. Silver planned roughly a week-long trip to Zurich, Switzerland.  Tr. at 90.  They would depart in the evening on June 4, 2019 from New York City.  Prior to their flight, Mr. Silver visited his internist physician, Dr. John Scrocca, on the morning of June 4, 2019 for treatment regarding brachial plexus neuropathy, myalgias, neck pain, and pain down both his arms and hands.  Exhibit 7 at 12-13.  Dr. Scrocca conducted a neurological exam and recorded that Mr. Silver had "1+ weakness in both upper extremities."  Id. at 13.  There is no record of Mr. Silver mentioning any of his alleged leg pain, numbness, or tingling at this visit.  Id. at 12-14.  During the fact-finding hearing, Mr. Silver was questioned as to why he did not mention his right and left leg pain/fatigue to Dr. Scrocca.  Tr. at 98.  Mr. Silver stated he "didn't think anything of it" because "it was a few months back" and because he "was totally focused . . . on [his] arms and [his] shoulders."  Id.  At the end of visit, Dr. Scrocca cleared Mr. Silver to fly and stated that he would need to "be treated with a methylprednisolone Dosepak and Valium 2 mg at bedtime upon his return."  Exhibit 7 at 13.

3

Mr. Silver and his wife then flew to Zurich on the evening of June 4, 2019. While in Zurich, Mr. Silver's health began to deteriorate. Ms. Cohen testified that Mr. Silver had to take multiple rest breaks during their walk around the city, that he became nauseous, and started to have difficulty standing and sitting. Mr. Silver then called his neurologist, Dr. Amy Hua, on the morning of June 6, 2019. Tr. at 139. Because Mr. Silver had developed "difficulty with swallowing, and distal upper and lower extremity weakness," Dr. Hua advised Mr. Silver to "seek medical attention in the nearest emergency room." Exhibit 12 at 14. Ms. Cohen then called emergency services in Zurich which then transported her and Mr. Silver to Zurich University Hospital. Tr. at 139-40.

Mr. Silver was admitted to Zurich University Hospital on June 6, 2019 and remained there until June 18, 2019. Once admitted, Mr. Silver was "noted to have flaccid tetraparesis, areflexia." Exhibit 4.1 at 10. An EMG/NCS test was conducted on June 7, which showed "markedly prolonged latencies with predominantly demyelinating disease, [consistent with] Guillain Barré Syndrome, and some axonal loss." Id. He was later diagnosed with Guillain Barré Syndrome, Miller-Fisher subtype. Exhibit 3.1 at 1. On June 10, Mr. Silver suffered from "tachycardia/afib for which [an] amiodarone drip . . . [and] a therapeutic heparin drip" were given. Exhibit 4.1 at 10. Mr. Silver then developed microhematuria and was treated with Augmentin for pneumonia. Mr. Silver went into "respiratory failure with the need for artificial ventilation on June 11th." Id.; Exhibit 3.1 at 2. On June 15, he received a tracheotomy and was put on a ventilator. Exhibit 4.1 at 10. Mr. Silver was discharged from Zurich University Hospital and medevacked back to Columbia Presbyterian Hospital in the United States on June 18, 2022. Tr. at 144; Exhibits 4.1-4.4.

### D.    Remaining Medical Events

Mr. Silver then underwent a lengthy recovery. These details are not relevant to determining whether the flu vaccination caused his GBS. See Pet'r's Br., filed Sep. 26, 2024, at 4 (ending recitation of events in June 2019); Resp't's Br., filed Nov. 22, 2024, at 7 (ending recitation of events in October 2019). By the time Mr. Silver testified at a hearing in November 2021, he was living independently, driving a car, and able to walk (although not as far as previously). Tr. 55.

## II.    Procedural History

The procedural history is divided into three sections. The first section explains the activities regarding the dispute over the events that happened in Mr. Silver's life from January 2019 to early June 2019. The second section outlines the various reports from experts, changes in Mr. Silver's theory of relief, and the submission of briefs. The third section explains why a resolution on the papers is appropriate.

### A.    Events from Petition to Finding of Fact

Represented by Attorney Ira Newman, Mr. Silver filed a petition for compensation under the National Vaccine Injury Compensation Program—along with an affidavit and medical records—on February 10, 2020. Pet'r's Pet.; Exhibits 1-2. Mr. Silver alleged that roughly three or four weeks after he received the flu vaccine, he began to have numbness, tingling, and pain in

his legs.  Pet. ¶ 4.  He asserted that his "Guillain-Barre syndrome was caused-in-fact by the January 8, 2019 influenza vaccine."  Id. ¶ 12.  Over the next eight months after filing his petition, Mr. Silver submitted additional medical records and evidence to support his claim.  See generally Exhibits 1-16.[2]

The Secretary reviewed this material and stated that compensation was not appropriate. Resp't's Rep., filed Jan. 31, 2021.  The Secretary argued "petitioner's description of 'slowly progress[ing]' symptoms [were] unreported to his physicians beginning in mid- to late January of 2019" and suggested that this "[wa]s not consistent with the acute onset of GBS in June."  Id. at 8.  The Secretary went on to state that "medical records show that [Mr. Silver] did not present with onset of GBS until early June 2019, approximately five moments after vaccination," meaning that "onset of . . . GBS was well outside the Table Frame of 3-42 days following vaccination."  Id. at 6

A status conference was then held on February 18, 2021 to discuss Mr. Silver's updated medical records and the Secretary's report.  See Order, issued Feb. 19, 2021.  There, petitioner was told to file an affidavit regarding the onset of his symptoms.  Id.; see also Order, issued June 9, 2021; Order, issued July 28, 2021.

A virtual hearing was held via Microsoft Teams on Tuesday, November 16, 2021.  See id.  Testimony was provided by Mr. Silver, Ms. Robyn Cohen (Mr. Silver's wife), and Mr. Silver's friend, Mr. Richard Baumer.  Their testimony and the materials contained in the record are the basis for the findings of fact recounted above.

### B.      Development of Reports from Retained Experts

Although the parties attempted to resolve the case informally, efforts were not successful. See Resp't's Status Rep., filed Mar. 30, 2022.  Thus, the next step was to resolve the disputed issues of fact, which was done through the December 16, 2022 Finding of Fact.  A set of instructions for expert witnesses was issued on January 27, 2023.  The instructions offered guidance for whether Mr. Silver was pursuing an on-Table claim, an off-Table claim, or both an on-Table and off-Table claim.

### 1.      Lawrence Shields and His First Two Reports

Background.  Information about Dr. Shields's background is found in his updated curriculum vitae, filed as Exhibit 46.  Dr. Shields graduated from the New York University College of Medicine in 1965.  He had an internship in medicine and then a residency in neurology.  He became board-certified in psychiatry and neurology in 1976.  He has practiced as a neurologist for 50 years during which time he was affiliated with various hospitals.  When he wrote his first report, he had not treated any patients with GBS in the last five years.

First Two Reports.  Mr. Silver submitted a 22-page report from Dr. Shields, dated March 20, 2023, as Exhibit 21.  Mr. Silver obtained more medical records.  Thus, he filed another 22-

---

[2] See also Pet'r's Notice of Filing, filed Dec. 9, 2020 (showing Mr. Silver refiled Exhibits 1-16).

page report, also dated March 20, 2023, as Exhibit 33.  This decision cites Dr. Shields's more recent report, which is Exhibit 33.

After some introductory sections, Dr. Shields begins his report by reviewing Mr. Silver's history of present illness, extracted from medical records and affidavits.  Exhibit 33 at 2-4.  Dr. Shields adds a more extensive section, called "Past Medical History," that appears to have been derived from an interview and examination with Mr. Silver.  Id. at 4-6.  More information about Mr. Silver's "Current Status" is also presented.  Id. at 6-7.  The results of Dr. Shields's examination of Mr. Silver are presented in pages 7-10.  Dr. Shields concludes his presentation of background information about Mr. Silver with a list of 13 diagnoses.  Id. at 10-11.

In the next section of Dr. Shields's report, he discusses medical concepts.  Dr. Shields describes the human immune system and how autoimmune diseases can present through molecular mimicry.  Exhibit 33 at 11-13.  Dr. Shields also presents information about medical conditions relevant to this case, including GBS, GBS variants, and Parsonage-Turner syndrome.  Id. at 13-17.

The last section of Dr. Shields's report, titled "Analysis," discloses Dr. Shields's opinions.  Essentially, Dr. Shields opined that Mr. Silver developed GBS within the time listed in the Vaccine Injury Table:

> • Mr. Silver developed low back pain and intermittent left lower extremity radiation shock-like pain and fatigue, beginning two to four weeks, evident by late January, after said vaccination (following by some progression), well established early semiology of GBS (ref: Continuum. October 2020. Vol 26, 5th issue. Peripheral nerve and motor neuron disorders.)
>
> • These symptoms persisted until June 2019 when PTS recrudesced and a few days later, classic GBS, progressing to Miller-Fisher and pharyngeal cervical brachial variants became dramatically manifest.
>
> • As mentioned above, back and lower extremity semiology, along with fatigue and some progression, as well known, accepted first manifestations of GBS, present in Mr. Silver's case for approximately four months in the plateau phase of GBS (see section on GBS).

Exhibit 33 at 19.  Dr. Shields maintained that the event that "catapulted Mr. Silver's GBS plateau phase to full blown variants is made obvious by the PTS [Parsonage-Turner syndrome], whose precedence to said GBS exacerbation is documented in his pre-Switzerland visit to Dr. J. Scrocca."  Id.  Dr. Shields repeated his opinion that Mr. Silver's "fatigue, low back and electroshock-like left lower extremity pain without sphincteric or saddle complaints . . . represents signs/symptoms of GBS."  Id. at 20.

Finally, Dr. Shields defined the scope of his opinions.  He stated that Mr. Silver's GBS arose within the time listed in the Vaccine Injury Table and that Mr. Silver fulfilled the criteria

6

for a Table Claim.  Dr. Shields added: "Petitioner is not pursuing a claim for any injury not contained in the Vaccine Table."  Id. at 21.

Dr. Shields's first two reports were discussed in a May 23, 2023 status conference.  The undersigned commented that because Mr. Silver is pursuing only an on-Table claim, much of Dr. Shields's report was not relevant.  The only question for an on-Table claim was whether Mr. Silver fulfilled the regulatory definition of GBS in the time listed on the Table.  In any event, the Secretary stated that he was preparing to obtain a responsive report from an expert, who turned out to be Dr. Jamieson.

### 2.   Dara Jamieson and Her First Report

Background.  Dr. Jamieson is a clinical associate professor of neurology at Weill Cornell Medicine.  Before having this academic appointment, she practiced neurology for more than 30 years.  She became board-certified in psychiatry and neurology in 1987.

First Report.  The structure of Dr. Jamieson's report roughly parallels the structure of Dr. Shields's first reports, except Dr. Jamieson did not examine Mr. Silver.  For example, Dr. Jamieson reviews and summarizes Mr. Silver's medical history.  Exhibit A at 2-7.  Dr. Jamieson also discusses GBS, GBS variants, and brachial plexopathy.  Id. at 7-13, 15.  Dr. Jamieson appears to opine that flu vaccination is not associated with GBS based upon epidemiologic studies going back to 2004.  Id. at 14-15.

Dr. Jamieson analyzed Mr. Silver's case starting with an assumption that "Mr. Silver began to experience leg pain, numbness, and/or tingling during the last week of January 2019." Exhibit A at 17.  In Dr. Jamieson's opinion, Mr. Silver developed a form of GBS in June 2019. The diagnostic criteria for various forms of GBS include a criterion that "clinical deterioration that reaches its maximum neurological deficit within hours to 28 days.  Neither AIDP/GBS nor other GBS variants cause months of mild, smoldering symptoms prior to declaring the diagnosis with the rapid onset of marked neurological deficits, reaching a clinical nadir months after the disease."  Id.  She continued: "If Mr. Silver's GBS had been present in January 2019, then he would have sought medical care for his GBS symptoms sooner than June 2019. It is my opinion that Mr. Silver had GBS with an onset over four months after his influenza vaccination, without any causative link to the influenza vaccine."  Id. at 17-18.

### 3.   Dr. Shields's Third Report

Dr. Shields responded to Dr. Jamieson's report in a 13-page report, dated July 7, 2023. Exhibit 35.  A theme of this Dr. Shields's response is that Dr. Jamieson wrongly believes "the diagnosis of complicated neurologic and vaccine medical issues in complex individual patients, such as Neil Silver, can be based on literature." Rather, according to Dr. Shields, "It is mandatory and the rule that medical etiologic diagnosis of the individual patient requires individuation, that is physical examination, common sense, analysis and differential diagnosis beyond "evidence based medicine" especially in cases which are unique and cannot be explained by studies of statistical population comparison, descriptions and trends and diagnostic criteria derived from such studies." Id. at 1.  Dr. Shields links Mr. Silver's presentation to "mild

Guillain-Barre syndrome," described in an article by Green and Ropper. Dr. Shields criticizes Dr. Jamieson for not examining Mr. Silver.

Much of the remainder of this report is either a variation on those themes or repetition of points from the previous report. See Id. at 2-13.

### 4.    Assessment of the Scope of Mr. Silver's Claims and Mr. Silver's Definition of His Claims

Following Dr. Shields's July 7, 2023 report, a relatively lengthy order was issued. The order pointed out that it appeared that Mr. Silver was pursuing only an on-Table claim and not pursuing an off-Table claim. If Mr. Silver was pursuing an on-Table claim only, then the relevant question would be whether Mr. Silver suffered from GBS within 3-42 days of the vaccination. The order set a status conference to discuss whether Mr. Silver was pursuing an off-Table claim. Order, issued July 11, 2023. During the status conference, the parties also discussed the differences between an on-Table claim and an off-Table claim. Pursuant to DiMasi v. Sec'y of Health and Hum. Servs., No. 2022-1854, 2023 WL 4697122, *8 (Fed. Cir. July 24, 2023), Attorney Newman was expected to have Mr. Silver define his causes of action via an affidavit. Order, issued July 25, 2023.

As directed, Mr. Silver considered his choices about an on-Table and off-Table claim. Mr. Silver averred that: "Based on discussions with [his] attorneys, your Petitioner has decided to pursue only an on-Table claim. Your petitioner is not pursuing an off-Table claim." Exhibit 37 (affidavit, signed Aug. 6, 2023) ¶ 4.

### 5.    Dr. Jamieson's Second Report

Dr. Jamieson responded to Dr. Shields's most recent report in a four-and-a-half page report, filed as Exhibit C. Dr. Jamieson stated that the diagnosis of brachial plexus neuropathy just before Mr. Silver traveled to Switzerland was "incorrect" in retrospect because Mr. Silver's bilateral upper extremity weakness "was actually the onset of his symptoms of GBS that evolved over the next few days." Id. at 1-2. Dr. Jamieson defended her lack of examination because "an examination of [Mr. Silver] years after his diagnosis of GBS in June 2019 would not change my opinions." Id. at 2.

Dr. Jamieson also defended her reliance on evidence-based medicine. She asserts that "Evidence based medicine is the accepted methodology that educators, including myself, use to teach medical students and residents how to analyze data to determine a patient's clinical diagnosis and care." Id. at 2-3. Dr. Jamieson addressed the Green and Ropper article, stating that "Nowhere in this cited paper does it say that 'mild GBS' can smolder for over four months, before flaring to produce severe GBS symptomatology." Id. at 3. Dr. Jamieson concluded: "Mr. Silver had GBS with his onset of the disease occurring over four months after his influenza vaccination, without any causative link to the influenza vaccine. And any symptoms that occurred prior to the onset of his episode of GBS in June 2019, were not related to GBS." Id. at 4.

8

### 6.    Dr. Shields's Fourth Report

This 12-page report is basically devoted to the topic of evidence-based medicine and why, in Dr. Shields's opinion, evidence-based medicine cannot inform an analysis of an individual.  Although there are many details in this report, Dr. Shields's conclusion is an apt summary of his opinion:

> Dr. Jameison's September 7, 2023 submission consists of defense of her inappropriate use of EBM and demonstrates the failure to employ basic medical precepts for analysis of Mr. Silver's case, along with parsing of terms, and failure to deal with or analyze the uniqueness of said case or consider basic applicable clinical precepts and principles.

Exhibit 38 at 12.

This report appeared to complete the disclosure of opinions from the parties' retained experts.  See Resp't's Status Rep., filed Oct. 31, 2023.

### 7.    Briefing Order and One Additional Expert Report

The parties were next directed to advocate through briefs.  The order explained that because Mr. Silver was pursuing an on-Table case only, Mr. Silver was not required to establish that the flu vaccine caused his GBS.  Order, issued May 13, 2024, at 5.  The order also mistakenly and confusingly directed Mr. Silver to explain the diagnostic criteria Dr. Shields used for GBS.  Id. at 4.  In a status conference held on May 22, 2024, the parties expressed a willingness to have the case resolved on the papers, that is, without a hearing.

As directed in the May 13, 2024 briefing order, Mr. Silver obtained a report from Dr. Shields, which is 11 pages, about the diagnostic criteria for GBS.  Exhibit 44.  The details from this report are set out below.

Upon reviewing this report, the undersigned realized that the briefing order sent Mr. Silver down a wrong path.  Because Mr. Silver was maintaining an on-Table claim, the issue was whether Mr. Silver fulfilled the definition of GBS set forth in the regulations.  Thus, Mr. Silver was offered a chance to file a brief explaining why he met the regulatory definition of GBS, which could be accompanied by a report of no more than two pages from Dr. Shields focused on the regulatory definition of GBS.  Order, issued Aug. 9, 2024.

### 8.    Redefining Mr. Silver's Claim

Another status conference was held.  Attorney Newman stated that Mr. Silver could not meet the regulatory definition of GBS, most specifically that Mr. Silver's progression of GBS did not decline to nadir within 28 days.  Thus, Mr. Silver intended to pursue an off-Table claim only.  Order, issued Sep. 3, 2024.

Mr. Newman stated that this switch was not prejudicial because Dr. Shields had already addressed the Althen prongs.  The Secretary was satisfied that Dr. Jamieson had adequately

addressed Dr. Shields's opinion.  Thus, the parties agreed additional reports were not required. Id.

Because Mr. Newman was relinquishing Mr. Silver's on-Table claim, Mr. Newman was again directed to confirm this plan with his client via an affidavit.  Id.  Mr. Silver concurred with this plan.  Exhibit 51 (aff., filed Sep. 11, 2024).

### 9. Briefing

Mr. Silver argued that the flu vaccine caused him to suffer GBS, which started in January 2019.  He presented a causation-in-fact analysis.  Pet'r's Br., filed Sep. 26, 2024.[3]

The Secretary opposed an award of compensation.  A primary issue was that the Secretary contended that Mr. Silver did not have GBS in January 2019.  Resp't's Br., filed Nov. 22, 2024.

Mr. Silver did not submit a reply, making the matter ready for adjudication.

### C. Adjudication on the Papers

Special masters possess discretion to decide whether an evidentiary hearing will be held. 42 U.S.C. § 300aa-12(d)(3)(B)(v) (promulgated as Vaccine Rule 8(c) & (d)), which was cited by the Federal Circuit in Kreizenbeck v. Sec'y of Health & Hum. Servs., 945 F.3d 1362, 1365 (Fed. Cir. 2020).  One factor to consider is whether the parties have had a full opportunity to present their cases.

Here, both parties have had a fair opportunity.  In particular, Mr. Silver filed the last expert report.  In addition, Mr. Silver could have filed a reply brief, but chose not to.  In addition, although the parties' preference is not dispositive, the parties preferred to resolve the case without any oral testimony from the experts.  In an October 1, 2025 status conference, Mr. Newman confirmed his desire to resolve the case based upon the papers because, in part, Mr. Newman understood that Mr. Silver was ill and may not be able to testify.

For these reasons, Mr. Silver's case will be evaluated based upon the present record.

## III. Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

---

[3] Although Mr. Silver designed his brief as Exhibit 52, it will be cited as "Pet'r's Br."

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV.    Analysis Part One---Diagnosis

The primary (but not only) dispute is whether Mr. Silver suffered from GBS in January 2019.  Mr. Silver is required to establish this diagnosis as a foundation for his claim.  If Mr. Silver succeeded in presenting preponderant evidence establishing GBS as a diagnosis in January 2019, then other issues would be considered.  See Broekelschen v. Sec'y of Health and Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010) (in some circumstances, the special master may "first determine which injury was best supported by the evidence in the record before applying the Althen test").

The assessment of the accuracy of diagnosis involves weighing evidence on two topics: diagnostic criteria and 's signs and symptoms.  On both points, guidance from medical doctors, who are the experts in the field, is critical.

### A.    Diagnostic Criteria

For assessing whether Mr. Silver suffered from GBS, the regulatory definition plays a role, but not a decisive role.  How the Secretary chose to define GBS for purposes of creating a Table injury may (or may not) match the generally accepted criteria for GBS.  As a matter of logic, it is conceivable that the Secretary's regulatory definition is smaller (or narrower) than the definition that the medical community would recognize.  This point can be visualized as concentric circles in which the regulatory definition is a smaller circle subsumed within a larger circle.



Therefore, Mr. Silver's recognition that he did not fulfill the regulatory definition of GBS does not, by itself, doom his claim that he suffered from GBS defined by some other criteria.

See Roach-Yohey v. Sec'y of Health & Hum. Servs., No. 17-1744V, 2025 WL 3143497, at *17 (Fed. Cl. Oct. 17, 2025) (acknowledging that "the finding that [a petitioner] did not meet the regulatory definition of [a condition] leaves open the possibility that she suffered [that condition] as defined elsewhere").  An ensuing question, therefore, is when Dr. Shields asserts that Mr. Silver suffered GBS in January 2019, what criteria is Dr. Shields using?  In this sense, although the May 13, 2024 briefing order was mistaken (at the time) for inquiring about this topic, it turned out that any error was fortuitous because Mr. Silver has switched his claim from on-Table to off-Table.  Unfortunately, Mr. Silver's brief is not a model of clarity in this regard.  Thus, this decision draws more directly from Dr. Shields's most recent report.

As a preliminary point, Dr. Shields quotes an article written by Sonja E. Leonhard and others.  This article states "diagnosis of GBS can be challenging owing to heterogeneity in clinical presentation, an extensive differential diagnosis, and the lack of highly sensitive and specific diagnostic tools or biomarkers."  Exhibit 47 at 672.  While these authors acknowledge some variation in presentation, they identify in a bullet-point summary four features for when a doctor could suspect GBS.  These are:

- Rapidly progressive bilateral limb weakness and/or sensory deficits
- Hypo/areflexia
- Facial or bulbar palsy
- Ophthalmoplegia and ataxia

Id. at 673 (figure 1, item 1).[4]  The text expands upon these points:

*Typical clinical features*

GBS should be considered as a diagnosis in patients who have rapidly progressive bilateral weakness of the legs and/ or arms, in the absence of CNS involvement or other obvious causes. Patients with the classic sensorimotor form of GBS present with distal paraesthesias or sensory loss, accompanied or followed by weakness that starts in the legs and progresses to the arms and cranial muscles. Reflexes are decreased or absent in most patients at presentation and in almost all patients at nadir. Dysautonomia is common and can include blood pressure or heart rate instability, pupillary dysfunction, and bowel or bladder dysfunction. Pain is frequently reported and can be muscular, radicular or neuropathic. Disease onset is acute or subacute, and patients typically reach maximum disability within 2 weeks. In patients who reach

---

[4] Dorland's Illus. Medical Dictionary (33rd ed.) defines some of these terms:
"Hyporeflexia" means weakened reflexes.  Page 894.
"Areflexia" means absences of reflexes.  Page 128.
"Palsy" means paralysis.  Page 1348.  "Progressive bulbar palsy" places the paralysis in the muscles of the lips, tongue, mouth, pharynx, and larynx.  Page 1349.
"Ophthalmoplegia" means paralysis of the eye muscles.  Page 1311.
"Ataxia" means failure of muscle coordination.  Page 168.

maximum disability within 24 h of disease onset or after 4 weeks, alternative diagnoses should be considered. GBS has a monophasic clinical course, although TRFs and relapses occur in a minority of patients.

Id. at 674.

The article also recognizes that GBS can have unusual features as well:

*Atypical clinical presentation*

GBS can also present in an atypical manner. Weakness and sensory signs, though always bilateral, can be asymmetrical or predominantly proximal or distal, and can start in the legs, the arms or simultaneously in all limbs. Furthermore, severe and diffuse pain or isolated cranial nerve dysfunction can precede the onset of weakness.

Id.

In another place, the authors present more of a checklist:

Features required for diagnosis

• Progressive bilateral weakness of arms and legs (initially only legs may be involved)

• Absent or decreased tendon reflexes in affected limbs (at some point in clinical course)

Features that strongly support diagnosis

• Progressive phase lasts from days to 4 weeks (usually <2 weeks)

• Relative symmetry of symptoms and signs

• Relatively mild sensory symptoms and signs (absent in pure motor variant)

• Cranial nerve involvement, especially bilateral facial palsy

• Autonomic dysfunction

• Muscular or radicular back or limb pain

• Increased protein level in cerebrospinal fluid (CSF); normal protein levels do not rule out the diagnosis

13

• Electrodiagnostic features of motor or sensorimotor neuropathy (normal electrophysiology in the early stages does not rule out the diagnosis)

Features that cast doubt on diagnosis

[14 items]

Id. at 676.

In listing these items, the authors drew upon the Brighton Collaboration criteria. Id. at 675. The Brighton Collaboration criteria underlie Dr. Jamieson's opinion that Mr. Silver did not suffer from GBS in January 2019. Exhibit A at 17 (citing the Brighton criteria).

These various presentations show that GBS does have some diagnostic criteria. Although the article begins by noting there can be "heterogeneity in clinical presentation," this variation does not mean that anything can be GBS. Two features are "required" for diagnosis and eight features "strongly support" a diagnosis of GBS.

This article, which Dr. Shields submitted after he was called upon to explain the diagnostic criteria he used in diagnosing GBS, refutes Dr. Shields's complaints about evidence-based medicine. See Exhibit 38. "Evidence-based medicine" is defined as "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of the individual patient. It means integrating individual clinical experience with the best available external clinical evidence from systematic research." John B. Wong, Lawrence O. Gostin, and Oscar A. Cabrera, "Reference Guide on Medical Terminology" in Refernce Manual on Scientific Evidence (Fed. Jud. Ctr. 3d ed.) at 723. The Leonhard article displays a headline identifying it as "EVIDENCE-BASED GUIDELINES." Exhibit 47 at 671. Further, Leonhard and colleagues went through a process, involving seven rounds of review to reach a consensus. Id. at 673.

Accordingly, Dr. Shields's protests about using evidence-based medicine are misguided. His opinions against evidence-based medicine diminish his credibility. See Lemair v. Monster Energy Co., No. 5:17-CV-05104, 2018 WL 4144456, at *3-4 (W.D. Ark. 2018) (granting a Daubert motion to exclude the testimony of a doctor about diagnosis when the doctor distinguished herself from the doctors practicing evidence-based medicine); Gabbard v. Linn-Benton Housing Authority, 219 F.Supp.2d 1130 (D. Or. 2002) (granting a Daubert motion to exclude plaintiff's expert, a doctor, based, in part, upon the defendant's expert's assertion that the plaintiff's expert did not practice evidence-based medicine).

On the other hand, Dr. Jamieson has been using evidence-based medicine, as Dr. Shields recognized. Exhibit 38; see also Exhibit C at 2. Thus, Dr. Jamieson's standing is enhanced.

Accordingly, the items listed above will be considered in weighing the competing opinions from the experts about whether Mr. Silver suffered from GBS in January 2019.

14

**B.      Mr. Silver's Signs and Symptoms**

To repeat information from earlier, after Mr. Silver's flu vaccination on January 8, 2019, he did not seek medical attention until April 25, 2019, when he saw a dermatologist. Thus, there is an absence of medical records created during the critical time. This absence of medical records, in turn, means that there is no information about Mr. Silver's signs. "Signs," in this context, means "any objective evidence of a disease, i.e., such evidence as is perceptible to the examining physician, as opposed to subjective sensations (symptoms) of a patient." Dorland's at 1680.

Based upon crediting some testimonial assertions, the undersigned determined that

> Mr. Silver's alleged pain, numbness, and tingling in his legs began during the last week of January 2019. . . .
>
> The finding that Mr. Silver had pain, numbness, and tingling in his legs starting at the end of January needs to be placed in context. Although Mr. Silver experienced some pain, he was still able to walk his dogs with his wife. Similarly, although Mr. Silver required frequent breaks when he played basketball with his peers, he still was able to play until April of 2019.

Finding of Fact, issued December 16, 2022. Effectively, these constitute Mr. Silver's symptoms.

This list could be consistent with perhaps at most one of the four items the Leonhard article identifies as reasons a doctor should suspect GBS. This item that Mr. Silver comes closest to fulfilling is the first one: "Rapidly progressive bilateral limb weakness and/or sensory deficits." To give Mr. Silver the benefit of the doubt, his pain could be considered roughly the equivalent of weakness and his numbness and tingling could be roughly the equivalent of sensory deficits. But, these symptoms, according to Leonhard, are supposed to be "[r]apidly progressive." There is no persuasive evidence that Mr. Silver's pain, numbness, and tingling rapidly progressed. Indeed, Dr. Shields maintained that Mr. Silver had a four-month plateau. See Exhibit 35 at 11-12.

For the other three items, which are diminished reflexes, facial or mouth paralysis, and either eye muscle paralysis or a lack of muscle coordination, there is no persuasive evidence that Mr. Silver suffered from any of these conditions. With respect to muscle coordination and diminished reflexes, Mr. Silver's participation in roughly weekly basketball games is some evidence against Mr. Silver having these problems. Mr. Silver, himself, did not notice any change in his reflexes and was able to juggle three items during the relevant time. Tr. 88. In any event, Dr. Shields recognizes that without a neurologic examination, "documentation of hyporeflexia/areflexia was not possible." Exhibit 44 at 6. Dr. Jamieson is persuasive when she states that Mr. Silver did not present evidence regarding an impairment of his reflexes in January 2019. Exhibit A at 7-8. As such there is a substantial basis for crediting Dr. Jamieson's opinion that Mr. Silver did not suffer from GBS in January 2019.

Dr. Shields emphasizes that (a) Mr. Silver suffered from back pain and fatigue and (b) back pain and fatigue are consistent with GBS. Exhibit 44 at 2, 5-6. But, this opinion is not

persuasive for multiple reasons.  Although there is some evidence that Mr. Silver suffered from back pain, his wife associated back pain with Mr. Silver's long-standing trouble with Parsonage-Turner syndrome.  Tr. 122.  Any fatigue was, according to Mr. Silver's testimony, episodic.  Tr. 67-68.  Regardless of the extent that Mr. Silver had fatigue and back pain, fatigue is not identified among the diagnostic features of GBS.  See Exhibit 47 at 676.[5]  Back pain is one of several features that can support a diagnosis.  And as previously discussed, the features that are required for a diagnosis---progressive bilateral weakness and impair reflexes---have not been established.

At the end of the day, the lack of progressiveness is a significant flaw in any opinion that Mr. Silver suffered from GBS beginning in January 2019.  Dr. Jamieson has emphasized this point throughout her reports.  Initially, Dr. Jamieson wrote:

> The description of an indolent clinical course over months, with the onset of low-grade symptoms in January 2019 and nadiring of symptoms four months later in June 2019, does not fit the Brighton Collaboration GBS Working Group criteria for the diagnosis of GBS or its variants as a "Monophasic illness pattern AND interval between onset and nadir of weakness between 12 h and 28 days AND subsequent clinical plateau."

Exhibit A at 17.  In her second report, Dr. Jamieson added: "With over four months between the purported onset of claimed GBS-related neuropathic pain and his degree of maximal weakness, Mr. Silver did not have 'mild GBS' of onset in January 2019 that then worsened four months later."  Exhibit C at 4.  Dr. Jamieson's opinion is persuasive.

Overall, Dr. Shields's attempt to rationalize the multi-month period in which Mr. Silver was allegedly suffering from GBS by referring to Mr. Silver's uniqueness is not reliable, nor credible, nor persuasive.  Dr. Jamiesons's interpretation of the evidence leading to her opinion that Mr. Silver did not suffer GBS until early June 2019 is much more persuasive as it is consistent with the literature.

For these reasons, Mr. Silver has not met his burden of establishing with preponderant evidence that he suffered from GBS in January 2019.  This finding effectively ends Mr. Silver's claim.

## V.    **Analysis Part Two---Causation**

Because Mr. Silver is proceeding with an off-Table claim, he must establish that the flu vaccine was the cause-in-fact of his (non-regulatory) GBS.  Petitioners establish causation-in-fact by fulfilling the Althen prongs.  Petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and

---

[5] "Fatigue," however, is recognized as a common residual symptom of GBS.  Exhibit 47 at 680.

effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." <u>Althen v. Sec'y of Health & Hum. Servs.</u>, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

As to the third prong, Mr. Silver has not presented any evidence or argument that the appropriate temporal relationship between the flu vaccine and the onset of GBS can extend for approximately four months. Rather, Mr. Silver's argument is premised upon a finding that his GBS began in January 2019. <u>See</u> Pet'r's Br. at 19. But, as explained in the previous section, Mr. Silver has not made this foundational showing. Thus, he is not entitled to compensation.

## VI.    <u>Conclusion</u>

Mr. Silver's experience of GBS in Switzerland was terrifying. His recovery in New York City was lengthy and painful. For these experiences, Mr. Silver warrants sympathy. However, to receive compensation in the Vaccine Program, Congress has required petitioners to present persuasive cases, and the evidence here is lacking. Thus, Mr. Silver is not entitled to compensation.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master

17